**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES,<br>v.<br>WALDEMAR LORENZANA-CORDON (14),<br>    Defendant. | **Criminal Action No. 03-cr-331-14 (CKK)** |

**ORDER**
(April 11, 2018)

On April 2, 2009, a federal grand jury returned an indictment against Defendant Waldemar Lorenzana-Cordon charging Defendant with conspiring to manufacture, distribute and import cocaine into the United States from in or around March 1996 through 2009.  Defendant was subsequently extradited to the United States from Guatemala.  On March 22, 2016, after a five week trial, a jury returned a guilty verdict against Defendant.

After resolving several post-trial motions, the Court set a hearing for Defendant's sentencing on September 27, 2017.  However, that hearing was subsequently postponed because Defendant and his counsel could not agree on an approach to sentencing.  The hearing was then temporarily vacated when defense counsel informed the Court that Defendant intended to orally raise new factual issues at his sentencing.  The Court gave Defendant an opportunity to submit a pleading that addressed these new issues in writing instead of presenting them for the first time orally at his sentencing.  No such pleading was ultimately filed.  Nevertheless, the Court understood from defense counsel that there were still issues Defendant sought to raise orally at his sentencing, and that some of these issues overlapped with arguments that co-Defendant Eliu Lorenzana-Cordon had raised in relation to his own sentencing.  The Court opted to move forward with co-Defendant Eliu's sentencing and resolve these issues in that context before sentencing Defendant Waldemar.

1

On January 18, 2018, the Court issued an Order addressing many of the arguments Defendant Eliu had raised related to his sentencing. Defendant Eliu was then sentenced on February 22, 2018. Thereafter, the Court gave Defendant Waldemar an opportunity to consider the Court's January 18 Order, and submit a written pleading raising any additional arguments relevant to his sentencing that he had not already raised and that he would seek to raise orally at his own sentencing. On April 5, 2018, Defendant's counsel filed a Statement of Counsel indicating that Defendant appears to agree with his counsel that no new issues or arguments needed to be raised at this time, and that he would like to move forward with his sentencing. Therefore, the Court would expect that no new issues other than the ones addressed in this Order will be raised at the sentencing.

Accordingly, by separate Order, the Court will set a new sentencing date for the Defendant. The following Order addresses several contested legal and factual issues related to that sentencing.

**A. Defendant's Possession of Firearms**

Defendant has objected to the Probation Officer's recommendation that the Court apply an enhancement for the possession of a dangerous weapon (including a firearm) under U.S.S.G. 2D1.1(b)(1). Defendant's objection is overruled. The evidence at trial showed that Defendant possessed firearms during and in furtherance of his drug trafficking activities. For example, witnesses testified that Defendant and his workers possessed firearms during the receipt and distribution of cocaine shipments. *See, e.g.*, ECF No. 781 (March 2, 2016 Trial Transcript, morning) at 76:14-20. One witness also testified that she saw "80-100" armed men on Defendant's property during a drug transaction. ECF No. 788 (March 8, 2016 Trial Transcript, morning) at 40:22-25. That same witness also testified that she attended a meeting with

Defendant to discuss the theft of $3 million of narcotics, at which Defendant and others drew pistols and slammed them down on a table in front her. *Id.* at 42:21-24. One of Defendant's associates pointed a gun at the witness, while Defendant pointed his gun at another individual. *Id.* at 42:25-43:4. The Court finds that the enhancement for the possession of firearms clearly applies.

**B. Use of Aircraft**

Next, the Probation Officer recommended that the Court also apply a two level increase to the offense level computation because "[t]he co-conspirators used an aircraft other than a regularly scheduled commercial air carrier to import controlled substances." Section 2D1.1(b) states that a two level increase is authorized "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance." Defendant argues that this enhancement does not apply.

The Court disagrees. Although the record does not indicate that Defendants' drug trafficking organization used an aircraft to accomplish the final stage of importation—*i.e.*, the actual crossing of the United States border with cocaine—the record does show that for years the organization used aircraft as part of an overall scheme to import cocaine into this country. Defendant in particular was involved in the use of aircraft, acting as a "lookout" for aerial shipments. *See, e.g.*, ECF No. 780 (March 1, 2016 Trial Transcript, afternoon) at 42:24. Importing controlled substances is often an intricate process involving multiple stages, and a plain reading of section 2D1.1(b) does not indicate that the increase applies only if an aircraft is used in the *final* border crossing stage of that process. Where, as here, Defendants established and repeatedly used a regular scheme for importing cocaine into the United States that

incorporated the use of non-commercial aircraft, the two level increase set forth in section 2D1.1(b) is appropriate.

The Court is not aware of any case law from this Circuit addressing this issue. The parties have presented the Court with three cases from other Circuits which they contend are relevant. The first case is *United States v. Chastain*, 198 F.3d 1338 (11th Cir. 1999), in which the Eleventh Circuit concluded that section 2D1.1(b) did not apply in an instance where the defendants had merely *intended* to import controlled substances into the United States by use of an airplane. The court held that the enhancement was not applicable under such circumstances because "the language of the guideline clearly contemplates a completed event, an actual importation," and "[t]hat did not occur in [that] case." *Id.* at 1353. *Chastain* is of little help to the Court in this case. Unlike in *Chastain*, the evidence presented at trial in this case clearly indicated that the Defendants successfully imported considerable amounts of controlled substances into the United States using non-commercial aircraft.

More relevant are *United States v. Iacullo* and *United States v. Joelson*. In *Iacullo*, the Eleventh Circuit affirmed a district court's application of section 2D1.1(b) where "a private plane was used several times to pick up cocaine in Colombia and fly it to the Bahamas, while the cocaine was en route to this country," because under these circumstances "it is clear that a private plane 'was used,' within the meaning of § 2D1.1(b)(2)(A), during the importation scheme, of which [defendant] was an active participant." *United States v. Iacullo*, 140 F. App'x 94, 102 (11th Cir. 2005). In *Joelson*, the Ninth Circuit took the opposite position. In that case, the court vacated a district court's application of the enhancement where a private plane flew cocaine to Guatemala, but a commercial air carrier was used to actually bring the drugs across the American border. *United States v. Joelson*, 7 F.3d 174, 180 (9th Cir. 1993).

These two cases are irreconcilable. Ultimately, the Court finds the Eleventh Circuit's interpretation of section 2D1.1(b) in *Iacullo* more convincing because it better reflects the plain meaning of the text of the guideline. As stated above, section 2D1.1(b) authorizes an increase "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance." The Ninth Circuit's narrow interpretation, for which Defendant argues, is not required by the plain meaning of this text. Where, as here, drugs are conveyed by non-commercial aircraft as part of an importation scheme while they are en route to the United States, the aircraft can be said to be "used" to import drugs even if it is not the ultimate conveyance of the drug across the American border.

In sum, the Court concludes that a two level increase in the offense level computation under section 2D1.1(b) is appropriate in this case.

**C. Organizer or Leader**

Defendant also argues that the Court should not apply an enhancement to his sentence for his having been an organizer or leader of a drug conspiracy with five or more participants. U.S.S.G. 3B1.1(a). The Court agrees with the Probation Officer and the Government that this enhancement applies.

First, there were clearly at least five participants in Defendant's conspiracy, including his father, two brothers, business associates (Otto Herrera, Sebastiana Cotton, David Andrade, Marllory Chacon, etc.) and workers who reported to the Defendant and his brother Eliu Lorenzana-Cordon (Guasha, Luisito, Rigo Salguero, etc.).

Second, the record shows that Defendant was an organizer or leader of this conspiracy. In making this determination, the Court is instructed by the Sentencing Guidelines and the

commentary thereto.  That commentary instructs that "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. 3B1.1, n.4.  It also instructs that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  *Id.*[1]

Defendant organized and was present at high-level meetings and negotiated major drug deals.  *See, e.g.*, ECF No. 795 (March 14, 2016 Trial Transcript, afternoon) at 45, 48, 60.  He was involved in investment decisions.  *See, e.g.*, ECF No. 796 (March 15, 2016 Trial Transcript, morning) at 25:14-15.  He had his own customers.  *See, e.g.*, ECF No. 780 at 64.  Witnesses referred to him as a "big fish."  *See, e.g.*, ECF No. 788 at 44:21.  As described in more detail below, lower-level participants in the conspiracy worked for Defendant.  *See, e.g.*, ECF No. 796 at 16; ECF No. 775 (February 24, 2016 Trial Transcript, morning) at 74; ECF No. 784 (March 3, 2016 Trial Transcript, afternoon) at 46-47.  In fact, there is testimony that he oversaw large numbers of armed men on his property.  *See, e.g.*, ECF No. 788 at 40.  These are not the characteristics of a low-level, or even a mid-level, participant in a drug trafficking conspiracy.  They are the indicia of a high-level organizer and leader.

Defendant's argument that this enhancement cannot apply to him because he did not supervise any "participants" in the conspiracy is unavailing.  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."

---

[1] Accordingly, the fact that the Court has already determined that Defendant's brother, Eliu Lorenzana-Cordon, also qualifies as an organizer or leader of the conspiracy, ECF No. 991 at 14, does not mean that Defendant cannot also be an organizer or leader.

U.S.S.G. 3B1.1, n.1.  A party who gives knowing aid in some part of the criminal enterprise qualifies as a "criminally responsible party."  *United States v. Vega*, 826 F.3d 514, 539 (D.C. Cir. 2016).  The testimony at trial demonstrated that Defendant shared oversight for several criminally responsible "participants."

First, the record contains various references to Defendant directly overseeing small groups of unnamed workers.  *See, e.g.*, ECF No. 775 at 74:21-23 (noting that Defendant had "two or three" workers).  Second, the evidence demonstrated that Defendant shared oversight of certain specific individuals involved in the drug trafficking organization: Luisito Salguero, Rigo Salguero and La Guasha.  Although there was some testimony at trial that referenced these individuals only in the context of working for Defendant's brother, Eliu, *see, e.g.*, ECF No. 784 at 47:5-6 (referring to La Guasha as "Eliu's worker"); ECF No. 786 at 27:19-21 (same), there was also testimony that these men were "in charge of logistics for Eliu Lorenzana *and Waldemar Lorenzana*."  ECF No. 795 at 54:23-55:1 (emphasis added).  At least one of these men was also described as a "worker" of Defendant Waldemar who was "in charge of delivering the U.S. dollars."  *Id.* at 63:22-25.  Other testimony refers to the men as "employees" of both brothers.  *See* ECF No. 796 at 16:5-8.  This testimony establishes these "workers" or "employees" as both being knowing, criminally responsible participants in the drug trafficking conspiracy (primarily overseeing the logistics of the trafficking), and as being supervised—at least in part—by the Defendant.

Finally, even if the testimony described above left any uncertainty, the testimony of Sebastiana Cotton firmly establishes that Defendant personally, and without the involvement of his brother, supervised "participants."  As already referenced, Cotton testified that when she went to Defendant's property for a negotiation, Defendant had 80-100 armed men present, at

7

least ten of whom surrounded the table at which they negotiated.  *See* ECF No. 788 at 40-44.  Importantly, one of those men, Juancho Leon, sat at the table with Defendant Waldemar and Cotton during the negotiations.  *Id.*  Throughout the meeting, Juancho Leon's gun was pointed at Cotton, and he would touch it any time she moved.  *Id.*  While Cotton was in the bathroom, Juancho Leon told her cousin that if she "ma[d]e any moves" he would shoot her.  *Id.*  This meeting took place at Defendant's house, and at Defendant's invitation.  The reasonable conclusion from this testimony is that these men were effectively Defendant's henchmen, whose task it was to intimidate and, if necessary, use force on behalf of the Defendant.  As such, they gave knowing aid to Defendant's criminal enterprise.  Accordingly, the sentencing enhancement for leaders or organizers is appropriately applied to Defendant.

**D.  Multiple Conspiracies**

Finally, the Court does not understand Defendant's sentencing-related filings as an attempt to re-litigate the Court's rulings on the multiple conspiracies argument Defendants have repeatedly raised during this case.  Nonetheless, because the nature of the conspiracy is implicated by the arguments in Defendant's pleadings (*e.g.*, Defendant's argument that he did not play a leadership or organizing role in the conspiracy because he was merely a "subcontractor" of Otto Herrera-Garcia), the Court simply notes for the record that it has already explained its reasoning for rejecting this argument in two separate Orders.  *See* June 2, 2017 Mem. Op. and Order, ECF No. 931 ("June 2 Op."), at 5-9; March 16, 2016 Mem. Op. and Order, ECF No. 762.  As the Court most recently explained:

> The Court begins its analysis with Defendants' arguments regarding whether the evidence at trial demonstrated a single conspiracy or multiple conspiracies. Defendants both challenge the Court's denial of Defendants' joint request for a jury instruction on multiple conspiracies. WLC Mot. at 18-20; ELC Reply at 7-8. Defendant Eliu in particular also goes a step further and argues that there was

insufficient evidence to support the existence of a single conspiracy and that accordingly there was a variance between the conspiracy charged in the indictment and the evidence at trial. ELC Mot. at 23-29. The standards for these arguments are somewhat distinct. With respect to Defendants' challenge to the Court's denial of a multiple conspiracy jury instruction, "[i]f the record support[ed] the existence of multiple conspiracies, the jury [should have been] instructed to consider them." *United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009); *see also United States v. Graham*, 83 F.3d 1466, 1472 (D.C. Cir. 1996) ("Our rejection of appellants' insufficiency claim does not obviate the need to address this issue, for if record evidence supports the existence of multiple conspiracies, the district court should have so instructed the jury."). With respect to Defendant Eliu's insufficiency argument on the other hand, "[t]he verdict must be upheld if the evidence adequately support[ed] a finding that a single conspiracy existed," and the Court "[v]iew[s] the evidence in the light most favorable to the government." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988). Regardless of this distinction, both of these arguments fail because the evidence at trial demonstrated a single conspiracy, and did not support the existence of multiple conspiracies.

As Defendant Waldemar acknowledges, the Court already considered and rejected Defendants' argument that the evidence demonstrated multiple conspiracies in a "detailed Memorandum Opinion." WLC Mot. at 18. On March 16, 2016, the Court issued a Memorandum Opinion and Order denying Defendants' Joint Defense Motion for Multiple Conspiracy Instruction explaining why it found that the record evidence did not support the existence of multiple conspiracies. *See* Memorandum Opinion and Order (March 16, 2016), ECF No. 762. The Court will not repeat that analysis here, but instead reaffirms it and incorporates it in full such that it is a part of this Memorandum Opinion. The Court has reviewed all of the arguments in the parties' post-trial briefs and has also gone back and reviewed the relevant portions of the record. The Court has in particular reviewed the portions of the record cited by the government that indicate that the evidence at trial showed that the conspirators shared a common goal, were interdependent, and overlapped with each other to at least some degree. *See Brockenborrugh*, 575 F.3d at 737 ("Whether a course of conduct should be classified as a single conspiracy or divided into multiple conspiracies depends on whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan."). For the reasons set forth in the Court's March 16, 2016 Memorandum Opinion and Order, the Court reiterates that the evidence was sufficient to

demonstrate the existence of a single conspiracy, and did not support the existence of multiple conspiracies.

The Court also now adds that Defendants' multiple conspiracy arguments fail for the additional reason that Defendants have not demonstrated any prejudice. A variance between single and multiple conspiracies can only be grounds for reversal if it "substantially prejudices the defendant, as, for example, if the jury were 'substantially likely to transfer evidence from one conspiracy to a defendant involved in another.'" *United States v. Gatling*, 96 F.3d 1511, 1519 (D.C. Cir. 1996) (quoting Tarantino, 846 F.2d at 1391). "Substantial prejudice occurs when multiple defendants are charged with a large and complex conspiracy and spillover prejudice confuses the jurors." *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000). Similarly, failure to give a multiple conspiracy instruction is grounds for reversal only if the failure was prejudicial. *United States v. Cross*, 766 F.3d 1, 4 (D.C. Cir. 2013).

Assuming for the purposes of Defendants' arguments that the evidence at trial had demonstrated multiple conspiracies, Defendants have not suggested any plausible way in which this prejudiced them. The Court is not persuaded by Defendants' conclusory statements that they were prejudiced, see ELC Mot. at 28, because even if the Court were to accept that there were multiple conspiracies at play, the evidence certainly did not demonstrate any conspiracies that did not involve the Defendants. Accordingly, the danger of "spillover prejudice" to Defendants from one conspiracy to another is muted. *See United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997) ("Naranjo played a role in all aspects of the conspiracy. Accordingly, even if there were three separate conspiracies, Naranjo would have to be deemed a member of each and could not, therefore, have been the victim of any spillover prejudice."). Moreover, the Court agrees with the government that the danger of confusing the jury in this sense was very minimal given that there were only two Defendants at issue in this case. *Id.* (holding that "[t]he risk of 'spillover prejudice,' which may occur when a jury imputes evidence from one conspiracy to a defendant involved in another conspiracy, is less likely the fewer the defendants" and finding no such prejudice had occurred because "[o]nly four defendants were tried in this case."). Accordingly, for the independent reason that Defendants have not demonstrated prejudice, their multiple conspiracy arguments fail.

Finally, the Court pauses to address two arguments raised by Defendant Waldemar in his request that the Court reconsider this decision. First, Defendant contends that the government conceded

> that there were multiple conspiracies at issue in its closing argument. Having presided over the presentation of that argument and having reviewed the transcript carefully, the Court finds no merit in this contention. In its closing argument, the government noted the fact that certain witnesses were from different places than, and did not have relationships with, other witnesses. But the government did not suggest, let alone concede, that there were multiple conspiracies in the legal sense relevant to Defendants' argument. Instead, the government was merely noting that the testimony of these cooperating witnesses was reliable because they all testified consistently about the conspiracy despite having independent bases for their knowledge.
>
> Second, Defendant Waldemar contends that the Court should reconsider its ruling because it "relied heavily on the assertion that the Lorenzana brothers were the leaders" of a conspiracy, whereas in reality Otto Herrera was the conspiracy's leader. This argument is also not persuasive. As an initial matter, even if Defendants were not the "leaders" of the conspiracy, it is unclear why that necessarily means that the evidence demonstrated multiple conspiracies. Moreover, the Court simply disagrees that the evidence presented at trial demonstrated that Otto Herrera was the leader of the conspiracy at issue. Otto Herrera may have been a more significant or well-known drug trafficker in a general sense, but that does not mean that he was necessarily the leader of the particular conspiracy the government presented at trial, which focused on the Defendants and was different than the Otto Herrera Drug Trafficking Organization ("DTO"). Finally, regardless of Otto Herrera's purported leadership, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *United States v. Bras*, 483 F.3d 103, 113-14 (D.C. Cir. 2007) (internal quotation omitted). For the above reasons, the Court reaffirms its March 16, 2016 Memorandum Opinion and Order, incorporates into this Memorandum Opinion and Order as though stated in full, and rejects Defendants' multiple conspiracy arguments.

June 2 Op. at 5-9. Defendant has raised no reason for revisiting this holding. Accordingly, any arguments Defendant has attempted to make related to his sentencing with respect to multiple conspiracies are rejected.

***

Having resolved the contested issues addressed above, the Court will set a hearing for Defendant's sentencing by separate Order.

**SO ORDERED.**

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge